UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
YOU QING WANG,

                Plaintiff,

      - against -                       **FINDINGS OF FACT &**
                                              **CONCLUSIONS OF LAW**

XBB, INC. and MEI LAN CHEN,           18-CV-7341 (PKC) (ST)

                Defendants.
------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        A bench trial was held in this case from August 16 through 17, 2021.  Plaintiff You Qing

Wang sought to prove by a preponderance of the evidence that Defendants XBB Inc. and Mei Lan

Chen (collectively, "Defendants")[1] violated the Fair Labor Standards Act ("FLSA") and the New

York Labor Law ("NYLL").  Plaintiff offered evidence that Defendants failed to pay her a

minimum wage and overtime under both the FLSA and NYLL, and failed to provide her with

required notices under the NYLL.  The Court now issues its findings of fact and conclusions of

law, as required by Federal Rule of Civil Procedure 52(a).  After carefully considering the evidence

introduced at trial, the arguments of counsel, and the controlling law on the issues presented, the

Court concludes that Plaintiff has met her burden of proof as to all her claims for which she has

Article III standing, and Defendants have carried their burden as to their partial defense under the

"faithless servant" doctrine.  For the reasons below, the Court finds that Plaintiff is entitled to

**$83,725.27** in damages.[2]

---

[1] Defendant Zhao Yin Lian was dismissed from the case on November 27, 2021.  (*See* 11/27/2021 Docket Order.)

[2] Plaintiff has also moved for attorneys' fees.  (*See* Dkt. 58.)  The Court will consider that motion separately.

**BACKGROUND**

I.     **Trial**

Three witnesses testified at trial: Plaintiff, Xiaoqing Liu (a non-party witness), and Defendant Chen.  The parties also introduced various exhibits.  Below, the Court summarizes the relevant evidence introduced at trial and notes where the parties offered conflicting evidence.

A.     **Plaintiff's Employment at XBB**

Plaintiff testified that she arrived in the United States on January 23, 2013, and worked as a salesperson for a clothing shop called "XBB" (or "Xiong Bao Bao") from about June 2013 through about October 1, 2017.  (*See* Trail Transcript, Dkts. 57-1, 57-2 ("Tr."), 7:1–2; 5:22–6:3; 7:15–22; 6:17–25; 21:18–22; 130:5–6.)  Defendant Chen, who hired Plaintiff, operated XBB as a sole proprietorship from before the start of Plaintiff's employment until May 25, 2017, when it became incorporated.  (*See* Tr. 53:17–18; 124:9–23; *see also* Tr. 53:17–18.)  Contrary to Plaintiff's testimony, Chen testified that Plaintiff began working at XBB in August 2014.  (*See* Tr. 128:24–25.)

Plaintiff testified that XBB typically made between $3,000 and $5,000 in sales per day during March, April, September, and October (which Plaintiff explained are busy seasons), and between $1,000 and $2,000 during the remaining months.[3]  (*See* Tr. 14:1–4; 22:3–17.)  By contrast, Chen testified that XBB's "gross sales per year" amounted to only $150,000 in 2015, $150,000 in 2016, and $220,000 in 2017.  (*See* Tr. 137:2–139:11.)  XBB customers paid cash, and XBB did not generate receipts.  (*See* Tr. 21:23–22:2; 64:10–15.)

---

[3] XBB was open seven days per week (Tr. 133:20–21), so assuming it was open 30 days per month, this amount of estimated daily sales would total between $600,000 and $1,080,000 per year: (30 days x 4 months x $3,000-5,000) + (30 days x 8 months x $1,000-2,000).

2

Plaintiff was the only fulltime employee during the period she worked at XBB.  (*See* Tr. 33:4–34:4, 131:15–17.)  Plaintiff was allowed to eat one meal per day while working, although, according to Plaintiff, she was expected to serve customers during that time.  (*See* Tr. 11:8–12:2.) Plaintiff testified that, typically, she would leave the store for a few minutes to get food every day. (*See* Tr. 60:6–16.)

**B.      Plaintiff's Payment and Hours**

Plaintiff testified that when she began working for XBB, Chen told Plaintiff that Plaintiff would work from 11:00 a.m. through 9:00 p.m., six days a week, generally with Saturdays off. (*See* Tr. 9:21–10:10.)  Plaintiff testified that, in accordance with this schedule, Plaintiff typically worked for XBB six days a week from 11:00 a.m. until 9:00 p.m.  (*See* Tr. 10:19–23.)  By contrast, Chen estimated that Plaintiff worked from 11:30 a.m. to 8:30 p.m., with a two-hour break, six days a week.  (*See* Tr. 130: 15–17.)  Plaintiff testified that she worked an extra half hour at least once a week regularly, and at least twice a week during the four busy months every year.[4]  (*See* Tr. 13:11– 14:9.)  Plaintiff was out of the country and did not work from July 9, 2015, through August 11, 2015, and again from February 12, 2016, through February 21, 2016.  (*See* Tr. 6:21–25.)

When Plaintiff was hired, Chen did not give Plaintiff a written wage notice.  (*See* Tr. 10:16– 18.)  According to Plaintiff, Chen paid Plaintiff $70 per day until about June 2014, when her daily salary rose to $75.  (*See* Tr. 14:10–24.)  By contrast, Chen testified that Defendants paid Plaintiff an hourly rate, and that "sometimes the rate [was] $13 and sometimes the rates—her pay rates [were] 17 per hour."  (Tr. 198:10–13.)

---

[4] Plaintiff testified that she "occasionally" worked seven days a week during busy seasons, but, as discussed below, she provided insufficient detail to draw a reasonable inference as to how often.  (*See* Tr. 37:25–38:11)

Plaintiff explained that she received $5 per day for meals.  (Tr. 12:14–19.)  Plaintiff testified that she usually received her paycheck monthly, but her payday was frequently delayed by between five and 15 days.  (*See* Tr. 14:25–15:8.)  Plaintiff also testified that, when business was good, Chen occasionally would pay Plaintiff a daily bonus of $3, $5, or $10.  (*See* Tr. 55:16–23; 56:2–5.)  Chen did not articulate a formula to determine the amount of any bonus Plaintiff received.  (*See* Tr. 61:24–62:2.)  Chen paid Plaintiff in cash.  (*See* Tr. 19:3–16.)  Plaintiff introduced a single pay receipt, which lists 23 dates in a month, lists the remaining eight dates as "off," multiplies 23 by 75, and adds the sum of daily bonuses.  (*See* Dkt. 57-3; *see also* Tr. 166:5–168:3.)

Plaintiff testified that she was not paid for the last month she worked at XBB.  (Tr. 23:16–17.)  According to Plaintiff, she asked Chen for the money she was owed for this month, and Chen responded that she had forgotten.  (Tr. 23:22–24:11.)  In contrast, Chen testified that she paid Plaintiff her last month's wages.  (*See* Tr. 195:13–196:21.)

**C.     XBB's Failure to Maintain Records**

On Plaintiff's paydays, Chen would give her a receipt reflecting her days worked, days off, bonuses, and total payment for the specified period.  (*See* Tr. 15:11–13; 16:22; 17:7–20, 19:1–6, 55:2–56:18; *see also* Dkt. 57-3.)  Plaintiff was permitted to keep these documents, but did not. (*See* Tr. 56:19–57:16.)  Plaintiff testified that Chen also did not keep or maintain copies of these documents.  (*See* Tr. 18:21–25.)  According to Plaintiff, neither Chen nor anyone else at XBB kept a record of Plaintiff's arrival and departure times (*see* Tr. 10:24–11:7), and no record was kept of Plaintiff's bonuses (*see* Tr. 55:16–23, 56:2–5).  Chen testified that she had various records, but lost them before trial.  (Tr. 216:24–219:9.)

### D.        Plaintiff's Theft from XBB

While employed at XBB, there were occasions when Plaintiff stole money from the cash register.  In a deposition on July 3, 2019, Plaintiff admitted to defense counsel that she took "several thousands of dollars."  (Plaintiff's Deposition Transcript, Dkt. 40-9[5] ("Dep. Tr."), 23:3–24.)  At trial, however, she testified that "the more accurate estimate" is "a few hundred," and that she said "several thousand[]" in her deposition only because defense counsel "kept telling [her] that it was several thousand dollars."  (*See* Tr. 70:3–19.)  On cross-examination, Plaintiff testified that she stole money from the store "approximately under 10 times," and "[o]nly [in] 2017 when [Chen] did not pay [her] salary."  (*See* Tr. 42:10–16.)  Plaintiff said that each time she stole, she would take $5, $10, or $20.  (*See* Tr. 43:17–44:12.)  On redirect examination, Plaintiff estimated that she took a total of $200, and only in September 2017.  (*See* Tr. 69:12–21.)

Chen installed a new security camera at XBB around the beginning of September 2017 because the previous camera produced "a terrible, fuzzy recording."  (*See* Tr. 142:15–143:3.)  The new camera footage appears to show Plaintiff taking money from the cash register on various occasions during September 2017, but the amounts are unclear.  (*See* Dkt. 62.)

Chen testified at trial that after she realized Plaintiff was stealing, she called the police on October 1, 2017 to report Plaintiff's theft.  (Tr. 143:12–13.)  According to Chen, she "couldn't express [her]self clearly" when the police arrived, so they told her to "report the crime later," and left.  (Tr. 144:19–145:1.)  Chen testified that after the police left, she had a conversation with Plaintiff and several other people, in which Chen "heard [Plaintiff] say" she had stolen "a total of $20,000."  (*See* Tr. 145:2–146:4, 160:7–9.)  Xiaoqing Liu, a witness for the defense and a

---

[5] The Court admitted the transcript from Plaintiff's deposition as direct evidence at trial. (*See* Tr. 158:20–25); *see also* Fed. R. Civ. P. 32(a)(1); Fed. R. Evid. 801(d)(2).

neighboring store owner, also testified that Plaintiff admitted to taking $20,000 during that conversation.  (*See* Tr. 100:23–103:25.)  Both Chen and Liu said that Plaintiff admitted to stealing for "half a year."  (*See* Tr. 146:25–147:3 (Chen); Tr. 102:1–3, 104:12–13 (Liu).)  At trial, Plaintiff denied telling Liu or Chen how much she had taken.  (*See* Tr. 52:23–53:2.)

## II.    Post-Trial Procedural Background

Immediately after trial, Defendants moved for a directed verdict under Federal Rule of Civil Procedure 50.  (Tr. 234:25–235:6.)  Because some issues in the case came "down to a credibility battle between [Defendants] and [Plaintiff]," the Court denied Defendants' motion and directed the parties to submit proposed findings of fact and conclusions of law (Tr. 262:1–9), which they did on December 15, 2021.  (*See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. Br."), Dkt. 57; Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Br."), Dkt. 61.)  On December 29, 2021, Plaintiff submitted a response to Defendants' brief.  (*See* Dkt. 63.)

## STANDARD OF REVIEW

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  *Id.*  The "'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings."  *Hassoun v. Searls*, 968 F.3d 190, 202 (2d Cir. 2020).

## LEGAL STANDARDS

## I.    Fair Labor Standards Act

Sections 206 and 207 of the FLSA, which Plaintiff invokes, apply to an employer "whose annual gross volume of sales" is at least $500,000, and who "has employees handling, selling, or

otherwise working on goods or materials that have been moved in or produced for commerce." 29 U.S.C. § 203(s)(1)(A)(i), (ii); *see also id.* §§ 206, 207.  "The FLSA contains two primary worker protections: first, it guarantees covered employees a federal minimum wage; and second, it provides covered employees the right to overtime pay at a rate of one-and-a-half their regular rate for hours worked above forty hours a week." *Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 402 (2d Cir. 2019) (footnotes omitted); *see also* 29 U.S.C. § 207(a)(1).

The FLSA provides "for a private right of action by a covered employee against any employer who violates the Act's minimum wage and overtime pay provisions." *Mei Xing Yu*, 944 F.3d at 402 (quotations omitted).  Such employer "is 'liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.'" *Rana v. Islam*, 887 F.3d 118, 122 (2d Cir. 2018) (*per curiam*) (quoting 29 U.S.C. § 216).  "However, 'if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [s]he had reasonable grounds for believing that [her] act or omission was not a violation of the' FLSA, 'the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed' the original unpaid wage amount." *Id.* (quoting 29 U.S.C. § 260).  The employer's burden is "a difficult one," and "double damages are the norm and single damages the exception." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (brackets omitted).

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that [she] performed work for which [she] was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).  "When the employer has kept proper and accurate records, the

employee may easily discharge [her] burden by securing the production of those records." *Id.* at 362 (alterations omitted) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  But "if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference.'" *Id.* (brackets omitted) (quoting *Anderson*, 328 U.S. at 687). "[I]t is possible for a plaintiff to meet this burden through estimates based on [her] own recollection." *Id.* (collecting cases).  "Under these circumstances, 'the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (brackets omitted) (quoting *Anderson*, 328 U.S. at 687–88).  "Though courts have mainly applied this burden-shifting framework when there is a dispute as to the number of hours an employee worked, it can also be applied to other FLSA disputes, like an employee's regular rate . . . ." *Saldarriaga Saldarriaga v. IND Glatt, Inc.*, No. 17-CV-2904 (PKC) (SMG), 2019 WL 1332887, at *2 n.4 (E.D.N.Y. Mar. 25, 2019) (citations omitted) (collecting cases).

## II.   New York Labor Law

Under the NYLL, employers must pay employees at least minimum wage, *see* N.Y. Lab. Law § 652, and must pay "for overtime at a wage rate of one and one-half times the employee's regular rate" for hours above 40 hours a week, 12 N.Y.C.R.R. § 142-2.2.  In that respect, "the NYLL adopts [the FLSA] standard." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013).  When an employer fails to maintain adequate records, "[c]ourts use the same burden-shifting framework to determine liability for unpaid [wages] under the NYLL and the FLSA." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017) (brackets omitted), *aff'd*, 752 F. App'x 33 (2d Cir. 2018).  "But under the NYLL, an employer

8

who fails to keep accurate records shoulders a more stringent burden of proof," because it "does not permit an employer to discharge this burden by undermining the reasonableness of an employee's evidence that [s]he was underpaid." *Id.* Rather, employers who fail to maintain the appropriate records "bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements." N.Y. Lab. Law § 196–a(a). An employee may "recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest," and, "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due." *Id.* § 198(1-a).

"While the wording of the FLSA and NYLL liquidated damages provisions are not identical, there are no meaningful differences," and courts in the Second Circuit "therefore interpret the NYLL and FLSA as not allowing duplicative liquidated damages for the same course of conduct." *Rana*, 887 F.3d at 123. In contrast to the FLSA, however, "the NYLL permits the award of both liquidated damages and pre-judgment interest." *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 48 (E.D.N.Y. 2015). "The availability of both NYLL liquidated damages and pre-judgment interest remains true even where liability is found not only under the NYLL but also under the FLSA." *Id.* at 48–49 (quotations omitted).

The NYLL also requires an employer to pay its employees a "spread-of-hours" premium for each workday that an employee works more than 10 hours. 12 N.Y.C.R.R. § 142-2.4. This spread-of-hours compensation is equal to one hour of pay at the minimum rate. *Id.* That is, "an employee who works more than ten hours in one day must be paid an additional hour at the state minimum wage amount." *Rana*, 887 F.3d at 123 n.3. "New York law defines 'spread of hours' as 'the interval between the beginning and end of an employee's workday.'" *Cardenas v. Edita's*

9

*Bar & Rest., Inc.*, No. 17-CV-5150 (RPK) (RML), 2021 WL 4480570, at *11 (E.D.N.Y. Sept. 30, 2021) (brackets omitted) (quoting 12 N.Y.C.R.R. § 142-3.16).

Finally, under Section 195-1(a) of the NYLL, employers must give their employees, at the time of hiring, a written notice that includes their rate of pay and additional information.  N.Y. Lab. Law § 195(1)(a).  If an employee is not given this notice "within ten business days of his or her first day of employment," he or she may recover "damages of fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees."  *Id.* § 198(1-b).  Under Section 195(3), employers must give their employees accurate wage statements providing certain listed information.  *Id.* § 195(3).  If an employer fails to give an employee these statements, the employee may recover "damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees."  *Id.* § 198(1-d).  "Prejudgment interest is not available for violations of the wage statement or wage notice provisions."  *Gamero*, 272 F. Supp. 3d at 515 (alterations omitted).

## III.    Damages Calculation

To calculate overtime wages owed under the FLSA and NYLL, the court must first determine the "regular rate" the plaintiff received.  *See* 29 U.S.C. § 207(a)(1); 12 N.Y.C.R.R. § 142-2.16.  The "regular rate" is important for calculating damages, including overtime pay, which is one and a half times the "regular rate."  *See Caltenco v. G.H. Food Inc.*, 824 F. App'x 88, 89 (2d Cir. 2020) (summary order) (citing 29 U.S.C. § 207(a)(1); 12 N.Y.C.R.R. §§ 142-2.2, 146-1.4).

Under the FLSA, the regular rate is "the hourly rate actually paid the employee for the normal nonovertime workweek for which [she] is employed."  29 C.F.R. § 778.108.  "If the

10

employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if [the employee] receives no other form of compensation for services, [the employee's] regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked." *Id.* § 778.112.  The employee "is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek." *Id.*

Under the NYLL, "[i]f an employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."  12 N.Y.C.R.R. § 146-3.5(b). "[I]f an employee's 'regular rate' is below the required minimum wage, the employee's overtime rate is calculated using the required minimum wage as the 'regular rate.'"  *Peralta v. M & O Iron Works, Inc.*, No. 12-CV-3179 (ARR) (RLM), 2014 WL 988835, at *7 (E.D.N.Y. Mar. 12, 2014).

"Pursuant to the FLSA and NYLL, an employee is entitled to at least the minimum wage for the first 40 hours worked per week."  *Rodriguez v. Yayo Rest. Corp.*, No. 18-CV-4310 (FB) (PK), 2019 WL 4482032, at *6 (E.D.N.Y. Aug. 23, 2019), *report and recommendation adopted*, 2019 WL 4468054 (E.D.N.Y. Sept. 18, 2019).  A "[p]laintiff is entitled to recover the higher of the applicable federal or state minimum wage." *Id.*

Under the NYLL, prejudgment "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."  N.Y. C.P.L.R. § 5004(a).  "Prejudgment interest is calculated on the unpaid wages due under the NYLL, not on the liquidated damages awarded under the state law."  *Fermin*, 93 F. Supp. 3d at 49 (brackets omitted).  It is "computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter

shall be computed from the date incurred." N.Y. C.P.L.R. § 5001(b). "Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *Id.* "Courts applying N.Y. CPLR § 5001 have wide discretion in determining a reasonable date from which to award pre-judgment interest, and interest is calculated using the simple rate, not a compounded rate . . . ." *Fermin*, 93 F. Supp. 3d at 49 (citations and quotations omitted).

## IV.  Faithless Employee Doctrine[6]

"New York's faithless [employee] doctrine holds that one who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 229 (2d Cir. 2020) (quotations and brackets omitted). The "faithless" employee in such circumstances forfeits any "compensation paid *during the time period* of disloyalty." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 301 (2d Cir. 2006) (emphasis in original). "Moreover, a principal is entitled to recover from his unfaithful agent any commission paid by the principal." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (quotations omitted).

"New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture, and the New York Court of Appeals has not resolved which one applies in particular circumstances." *Feldman*, 977 F.3d at 237 (quotations omitted). "The distinction between the two regards whether [an employee's] breach of fiduciary duty must be

---

[6] Although this doctrine has historically been called the "faithless servant" doctrine, *see, e.g.*, *Sauer v. Century Fed. Sav. & Loan Ass'n of Long Island*, 418 N.Y.S.2d 464, 466 (App. Div. 1979), the Court opts for the less antiquated—and more accurate—label, "faithless employee" doctrine.

12

'substantial.'"  *Id.*  Under the substantiality standard "courts have found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior."  *Id.* (quotations omitted).  The alternate "standard suggests that misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture."  *Id.* (quotations omitted).

## FINDINGS OF FACT

Below, the Court explains its findings of fact with respect to (I) Defendants' annual earnings and engagement in commerce, (II) Plaintiff's hours and pay, and (III) Plaintiff's theft from Defendants.

## I.  Defendants' Annual Earnings and Engagement in Commerce

Although her evidence on this point was far from overwhelming,[7] Plaintiff has established by a preponderance of the evidence that Defendants earned more than $500,000 in annual sales and "ha[d] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce."  29 U.S.C. § 203(s)(1)(A)(i), (ii); *see also id.* §§ 206, 207. As Plaintiff testified, XBB generated at least $1,000 per day eight months of every year, and at least $3,000 per day the remaining four months.  (Tr. 22:6–17.)  This amounts to just over $600,000 annually.  Plaintiff had a basis for these estimates because she worked in the store from the time it opened to the time it closed, six days a week, for over four years, and she was responsible for managing and processing customers' transactions.  *Compare Perez v. Rossy's Bakery & Coffee Shop, Inc.*, No. 19-CV-8683 (SLC), 2021 WL 1199414, at *6 (S.D.N.Y. Mar. 30, 2021) (crediting the testimony of the owner of the defendant bakery because that person "was present in the bakery

---

[7] The Court noted that "the enterprise coverage issue and the $500,000 amount . . . comes close for purposes of" a direct verdict in Defendants' favor.  (*See* Tr. 250:23–251:1.)

every day" and thus "was in the best position to attest to its daily and weekly sales volume"); *Junmin Shen v. No. One Fresco Tortillas, Inc.*, No. 16-CV-2015 (RWL), 2018 WL 6712771, at *7 (S.D.N.Y. Nov. 26, 2018) (crediting a witness's testimony that the defendant "would have made $1,505 in sales per day for a total of $543,305 gross sales per year"); *Chang Mei Lin v. Yeh's Bakery, Inc.*, No. 12-CV-2146 (JG), 2013 WL 867436, at *3 (E.D.N.Y. Mar. 7, 2013) (denying summary judgment when the plaintiff "offered a sworn statement that the [defendant] bakery grossed more than $2,000 a day on average in sales," because "a juror could conclude from [this] testimony that the bakery grossed well over $500,000 annually"), *with Hanming Feng v. Soy Sauce LLC*, No. 15-CV-3058 (ENV) (LB), 2017 WL 6561160, at *5 (E.D.N.Y. Dec. 22, 2017) (concluding that the plaintiff failed to establish the $500,000 FLSA threshold because, "[b]y their words and demeanor, the testimony offered by the employee witnesses was incredible, wildly speculative and, in many instances, even contradictory").

Although Defendant Chen estimated that XBB's "gross sales per year" amounted to only $150,000 in 2015, $150,000 in 2016, and $220,000 in 2017 (*see* Tr. 137:2–139:11), the Court continues to have "some concerns about the veracity of that information" (Tr. at 241:3–5). Defendants offered no admissible records of these amounts (*see* Tr. 241:1–5), the Court found Defendants' "loss of records dubious at best" (*see* Tr. 242:9–13), and Defendants failed to offer "any other evidence on that particular issue" (*see* Tr. 240:25–241:1).[8]  Rather, Chen testified that

---

[8] At first, Chen testified that she lost XBB's records because of the Covid-19 pandemic "[b]ecause the shop closed down due to lack of business." (Tr. 217:9–12.) But when the Court pointed out that this lawsuit was filed in 2018, and asked whether "COVID and the store closing [in fact] had nothing to do with [Chen] not having the 2017 records," and whether "the 2017 and prior years' material was lost even before this lawsuit was filed," Chen responded, "That's right," "Possibly yes," and "I don't remember." (Tr. 218:20–219:3.)

14

she "just remember[ed] because that's just the approximate number."[9]   (Tr. 138:17–18.) Ultimately, as the Court observed at trial, Chen "seem[ed] to have a failure of memory" as to XBB's earnings, so the Court "didn't credit a lot of [Chen's] testimony" on that point.  (Tr. 242:9– 13.)  Plaintiff's recollection of XBB's daily earnings thus is more credible than Chen's estimates, and Plaintiff has carried her burden of showing that XBB earned more than $500,000 annually. Further, as to the "produced for commerce" element, the clothing sold at XBB was manufactured in China and imported into the United States, and XBB sometimes shipped clothing to customers outside of New York.  (Dep. Tr. 87:16–19, 93:24–94:9; Deposition of Mei Lan Chen, Dkt. 40-8, 90:16–25.)

## II.    Plaintiff's Hours and Pay

Defendants did not produce records of Plaintiff's hours or pay.  (*See* Tr. 10:24–11:7, 18:21– 25, 55:16–57:16.)  Thus, under the FLSA, Plaintiff "need[ed] only [to] present 'sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference,'" *Kuebel*, 643 F.3d at 361 (brackets omitted) (quoting *Anderson*, 328 U.S. at 687), at which point Defendants needed "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from [Plaintiff's] evidence," *Bouaphakeo*, 577 U.S. at 456 (brackets omitted) (quoting *Anderson*, 328 U.S. at 687–88).  And, "under the NYLL, [Defendants] shoulder[ed] [the] more stringent burden," *Gamero*, 272 F. Supp. 3d at 498, of "proving that [Plaintiff] was paid wages, benefits and wage supplements" in compliance with the statute, N.Y. Lab. Law § 196–a(a).

---

[9] Although Chen saw the amount in the cash register at the end of the day on at least some days (*see* Tr. 63:23–64:3, Tr. 206:7–25), she does not appear to have arrived at her estimates based on a recollection of total daily sales.

Plaintiff testified that she worked for XBB from June 2013 through about October 1, 2017 (*see* Tr. 5:22–6:3), with time off from July 9, 2015 through August 11, 2015, and from February 12, 2016 through February 21, 2016 (*see* Tr. 6:21–25). Because Plaintiff provided no evidence of which day in June 2013 she started working at XBB, the Court will assume she started on June 29, 2013 (the last working day in June 2013), and thus worked only one day that month.

According to Plaintiff, XBB paid her a daily salary of $70 for her first year and $75 thereafter (*see* Tr. 9:21–10:10, 14:10–24); she typically worked for XBB six days a week from 11:00 a.m. until 9:00 p.m. (*see* Tr. 10:1–2, 10:19–23); she "occasionally" worked seven days a week during busy seasons (*see* Tr. 37:25–38:11); and she worked an extra half hour at least once a week during slow seasons and an extra hour once a week during busy seasons (*see* Tr. 13:11–14:9).[10] Occasionally, when business was good, Chen would pay Plaintiff a daily bonus of $3, $5, or $10. (*See* Tr. 55:16–23; 56:2–5.) Plaintiff also introduced a single pay receipt, which lists 23 dates in a month, lists eight dates as "off," multiplies 23 by 75, and adds a sum of daily bonuses. (*See* Dkt. 57-3; *see also* Tr. 166:5–168:3.) Plaintiff explained—and Defendants do not dispute—that she received $5 per day for meals. (*See* Tr. 12:14–19.) Finally, Plaintiff testified that she was required to work during her meals if customers came into the store. (*See* Tr. 12:3–13:10; 38:12–39:12; 11:8–12:2.)

Defendants argue that Plaintiff failed to carry her initial burden under the FLSA because "she did not have [a] *credible* recollection regarding the pertinent facts." (Def. Br., Dkt. 61, at 3.)

---

[10] The Court interpreted Plaintiff's testimony to mean that during the slow seasons, she worked an extra half-hour one day per week, and during the busy seasons, she worked an extra half-hour two days per week, but that she still worked only six days per week. Though Plaintiff also testified that she occasionally worked seven days during a week, as discussed *infra*, this testimony was too inexact for the Court to use in calculating the spread-of-hours premium that Plaintiff is owed.

Defendants point out that "[Plaintiff] did not remember on which date in June 2013 she started working for Defendants, and on which date in September 2017 her employment ended;" she did not recall which days she worked late; and she did not remember "how much longer she had to stay late when she stayed late."[11]  (*Id.*)

These points are unavailing.  Plaintiff's inability to remember the precise day her employment began almost a decade earlier, or the precise day it ended four years earlier, does not negatively affect her credibility at all.  Nor does her inability to recall "on which days [she] worked how many hours" (*id.*), given that she worked for Defendants for over four years and worked late at least once a week during that time (*see* Tr. 13:11–14:9).  Plaintiff's inability to specifically remember the estimated 200 days she worked late, and the specific amounts of overtime on each of those days, does not cause the Court to doubt her credibility as to her hours and wages.  Where, as here, "'the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, . . . the solution is not to penalize the employee by denying [her] any recovery on the ground that [she] is unable to prove the precise extent of uncompensated work,' as such a result would be contrary to the 'remedial nature' of the FLSA."  *Kuebel*, 643 F.3d at 362 (brackets and ellipses omitted) (quoting *Anderson*, 328 U.S. at 687).[12]

---

[11] Defendants also rely on *Adami v. Cardo Windows, Inc.*, No. 12-CV-2804 (JBS), 2015 WL 1471844, at *9 (D.N.J. Mar. 31, 2015), where the court rejected the "[p]laintiffs' testimony that they worked 10–14 hours per day, six days per week," because this testimony was "undercut by documents showing . . . days when they worked fewer than eight hours, and weeks when they worked fewer than six days per week."  Here, however, there were no such documents in evidence.

[12] Although the Court finds Plaintiff's testimony about her hours and wages sufficiently credible, much of Plaintiff's testimony about other matters was not, as discussed *infra*.  (*See, e.g.*, Tr. 240:6–7 (Court noting that much of the testimony at trial, from both sides, was not credible).)

Because Plaintiff presented credible testimony creating a reasonable inference of her hours and pay, "the burden then shift[ed] to [Defendants] to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from [Plaintiff's] evidence." *Bouaphakeo*, 577 U.S. at 456 (brackets omitted) (quoting *Anderson*, 328 U.S. at 687–88). Under the NYLL, Defendants bore "the burden of proving that [Plaintiff] was paid wages, benefits and wage supplements." N.Y. Lab. Law § 196–a.

First, Defendants presented no credible evidence regarding Plaintiff's precise hours. Although Defendant Chen estimated that Plaintiff worked from 11:30 a.m. to 8:30 p.m., with a two-hour break, six days a week (*see* Tr. 130: 15–17), she offered no support for this assertion. As noted, she retained no records of when Plaintiff worked. (*See* Tr. 10:24–11:7.) She also was not in the store for much of the time Plaintiff worked. (*See* Tr. 33:4–20, 132:15–17, 133:5–19.) And although Chen testified that Plaintiff began working in 2014 (*see* Tr. 128:24–25), this is less credible than Plaintiff's testimony that she started in 2013, given that Plaintiff arrived in the United States in January 2013, and XBB was her first employer (*see* Tr. 7:1–10). Chen's uncorroborated testimony therefore fails to carry Defendants' burden "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from [Plaintiff's] evidence." *Bouaphakeo*, 577 U.S. at 456 (brackets omitted); *see Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 394–95 (E.D.N.Y. 2013) (concluding that restaurant defendants had "not presented evidence of the precise amount of work performed or evidence to negate the inference drawn from the [plaintiff's] evidence," because the "[d]efendants only presented one witness regarding the hours of the employees, and that witness admitted that he not only could not see the back door that employees frequently used, but that he was not present at the restaurant for the vast majority of the time period covered by th[e] suit").

18

Second, Defendants presented no credible evidence of how much Plaintiff was paid.  With respect to Plaintiff's bonuses, Chen testified that "the formula is in [Chen's] head," and that she is "not able to explain it clearly."  (Tr. 170:3–13.)  As to Plaintiff's hourly rate, Chen testified that "sometimes the rate is $13 and sometimes the rates—her pay rates are 17 per hour."  (Tr. 198:10–13.)  But Chen was unable to explain her formula for calculating this alleged—and apparently inconsistent—hourly rate.  (*See, e.g.*, Tr. 196:22–201:9.)  As the Court noted during trial, Chen's explanation of her purported formula "suggest[ed] that she [did not] use th[e] formula because what she . . . said ma[de] no sense."  (Tr. 200:10–14.)  Rather, the Court accepts Plaintiff's testimony that she received a daily salary of $70 and later $75, with $5 per day for meals.[13]  This is consistent with the one pay receipt—the authenticity of which is not disputed by Defendants—admitted as Exhibit 3, which clearly uses a daily salary of $75 rather than an hourly rate.  (*See* Dkt. 57-3.)

Finally, Chen did not give Plaintiff a written wage notice at the start of her employment or any time thereafter (*see* Tr. 10:16–18), or accurate wage statements listing the required details (*see* Dkt. 57-3).  N.Y. Lab. Law §§ 195-1(a), 195(3).

\*     \*     \*

Given the evidence at trial, the Court finds, by a preponderance of the evidence, that from June 29, 2013 through September 30, 2017 Plaintiff worked six days a week, from 11:00 a.m. to 9:00 p.m., and worked an additional 30 minutes one day a week for eight months a year, and an additional hour every week for four months a year.  Further, Plaintiff has shown, by a

---

[13]  Although Plaintiff testified that she was permitted to take $5 per day for meals "[a]pproximately one year after [she] started," she failed to specify the month she began receiving this amount (Tr. 38:15–23), and in her briefing she concedes that "[d]uring the first year of her employment, [she] was paid $75.00 per day ($70.00 base rate plus $5.00 per day for meals)" (*see* Pl. Br., Dkt. 57, at 14).

preponderance of the evidence, that she did not receive bona fide meal breaks, given that she was required to serve customers during meals. *See Ying Ying Dai v. ABNS NY Inc.*, 490 F. Supp. 3d 645, 651 (E.D.N.Y. 2020) ("[The plaintiff] did not have an uninterrupted break; if customers came into the store during her break, she was required to help them."); *id.* at 653 ("Because I find that the [the plaintiff] did not have bona fide meal breaks, I do not adjust her daily hours for breaks."). Although Plaintiff also testified that she "occasionally" worked seven days a week during busy seasons (*see* Tr. 37:25–38:11), this explanation is too vague to "show the amount and extent of the uncompensated work as a matter of just and reasonable inference," *Kuebel*, 643 F.3d at 361 (brackets omitted) (quoting *Anderson*, 328 U.S. at 687).

The Court also finds, by a preponderance of the evidence, that from June 2013 through May 2014, Plaintiff received a base rate of $70 per day, with $5 a day added for meals. From June 2014 through August 2017, Plaintiff received a base rate of $75, with $5 a day added for meals. Plaintiff was not paid during September 2017.[14] Thus, adding in Plaintiff's meal allowance, her daily salary was initially $75 and then $80. *See Lynch v. City of New York*, 291 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) ("[W]here an additional payment is made to an employee that is not reimbursing an expense, even where it is labeled a 'meal allowance payment,' it is properly included in the employee's regular rate for the purposes of calculating overtime compensation.").

## III.   Plaintiff's Theft

Plaintiff admitted to stealing money from Defendants while employed at XBB (*see* Tr. 23: 7–8), and the security camera footage appears to show her doing so (*see* Dkt. 62). To invoke the faithless employee doctrine, and to establish the amount, if any, that they may recoup from

---

[14] Defendants do not cite any evidence to the contrary in their proposed findings of fact and conclusions of law.

Plaintiff, Defendants bore the burden of proving when Plaintiff began stealing and the amount she stole. *See, e.g.*, *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 469 (S.D.N.Y. 2008) (noting that the defendant failed to "meet its burden of proving the Individual Plaintiffs' alleged misconduct underlying its faithless [employee] claims"); *Calderon v. Mullarkey Realty, LLC*, No. 14-CV-2616 (PKC) (RLM), 2018 WL 2871834, at *7 (E.D.N.Y. June 10, 2018) (noting that courts consider the faithless employee doctrine to be either an affirmative defense or a counterclaim); *Miller v. Levi & Korsinsky, LLP*, No. 20-CV-1390 (LAP), 2021 WL 535599, at *4 (S.D.N.Y. Feb. 12, 2021) (treating the faithless employee doctrine as an affirmative defense). For the reasons discussed below, Defendants have established that Plaintiff stole $3,000 from XBB over the span of one month.

### A.    Plaintiff Stole $3,000

Defendants have established that the amount Plaintiff stole was $3,000, and not $200 as Plaintiff contends. (*See* Pl. Br., Dkt. 57, at 5.) But Defendants have not established that Plaintiff stole $20,000, as Defendants contend in their briefing. (*See* Def. Br., Dkt. 61, at 5.)

At Plaintiff's deposition, before either party's counsel or the parties themselves had suggested anything else, Plaintiff testified that she stole "several thousand[]." (Dep. Tr. 23:6–8.) Contrary to Plaintiff's testimony at trial, she—not defense counsel—volunteered the "several thousand[]" figure in her deposition. (*See* Dep. Tr. 23:6–8; *see also* Tr. 82:1–10 (Court noting that although defense counsel suggested different amounts during Plaintiff's deposition, "it was not before she volunteered that it was several thousand").) The Court thus rejects Plaintiff's argument that she "repeated the 'several thousand' figure because it was given to her by Defense counsel." (Pl. Br., Dkt. 57, at 5.)

Defendants, in turn, did not provide sufficient evidence to support their argument that Plaintiff stole $20,000. The only evidence of the "20,000" figure was Defendant Chen's and third-

21

party Xiaoqing Liu's testimony.  And both Chen and Liu relied on Plaintiff's alleged admission in the conversation they had after the police had left.  Given the witnesses' descriptions of this conversation, the Court concludes that Plaintiff admitted to stealing approximately 20,000 Chinese Yuan—which equated to approximately $3,000—and not $20,000.

First, Chen and Liu testified that Plaintiff admitted to stealing "20,000," but neither credibly testified that Plaintiff said "20,000 *dollars*."  (*See* Tr. 146:3–4 (Chen: "I remember very clearly [Plaintiff] said: I haven't been stealing for this long.  It wasn't a lot.  It's only 20,000." Defense Counsel: "$20,000?"  Plaintiff's Counsel: "Leading."  The Court: "Yes. Sustained."); Tr. 147:18–24 (Defense Counsel to Chen: "So after the plaintiff said that she stole $20,000 in this conversation—" The Court: "Sustained.  She just said 20,000."  Defense Counsel: "Did I say 20,000?"  The Court: "No.  You said dollars."  Defense Counsel: "Oh, 20,000—okay."  The Court: "Yes, it's incorrect."); Tr. 100:25–101:2 (Liu: "[Plaintiff] said, I have not been doing this stealing for a long time.  I only took about 20,000.").)  Although Liu assumed that Plaintiff meant $20,000 "[b]ecause in the clothing store that's definitely [U.S.D.]" (Tr. 101:23–25, 103:23–104:2), Plaintiff and Chen sometimes discussed currency using Chinese Yuan rather than United States Dollars, as their text message conversation shows (*see* Tr. 87:6–9; *see also* Dkt. 57-6).  In 2017, when Plaintiff admitted to stealing "20,000," the exchange rate between Chinese Yuan and United States Dollars averaged 7.030:1.  *See* Yearly Average Currency Exchange Rates, IRS, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates (last visited Feb. 15, 2022).  Twenty thousand Yuan thus would have equated to about 2,845 United States dollars.  That the "20,000" admission related to Yuan, therefore, is consistent with Plaintiff's later testimony that she stole "several thousands of dollars."  (Dep. Tr., 23:3–24.)  It also might explain why Plaintiff,

who made just over $20,000 per year, said, "It wasn't a lot.  It's *only* 20,000" (Tr. 146:3–4 (emphasis added)), and "I *only* took about 20,000" (Tr. 100:25–101:2 (emphasis added)).

Second, given that XBB took in about $1,000-$2,000 each day for most of the year and $3,000-$5,000 for four months of the year, the Court finds it more plausible that Plaintiff stole roughly $3,000 rather than $20,000, which would have required Plaintiff to steal a more substantial amount of cash from the store's register than the evidence suggests, and on many days over a much more significant period of time than the evidence suggests.  Because Defendants bear the burden of proof with respect to their faithless employee affirmative defense/counterclaim, the absence of such evidence supports the $3,000 figure.

### B.    Plaintiff Stole Money During Her Last Six Months at XBB

Defendants have established that Plaintiff stole money during her final six months of employment at XBB.  First, both Chen and Liu testified that Plaintiff admitted to stealing for "half a year." (*See* Tr. 146:25–147:3 (Chen); Tr. 102:1–3, 104:12–13 (Liu).)  Second, Plaintiff testified that she stole money in increments of $5, $10, and $20.  (*See* Tr. 43:3–44:12.)  Crediting this testimony, Plaintiff would have needed to steal at least 150 times to accumulate $3,000.  The Court also finds it unlikely that Plaintiff stole $3,000 in September 2017 alone, given that Plaintiff would have needed to steal at least $100 every day to reach $3,000 in a month.  And although Plaintiff testified that she stole for only a month (*see* Tr. 66:8–10), she also testified that she stole only $200 total (Tr. 70:12–21), which, as noted, the Court does not find credible.  In fact, as the Court noted at trial, much of Plaintiff's testimony was not believable.  (*See* Tr. 240:6–7 (The Court: "Quite frankly, there's a lot of testimony that I found incredible on both sides.")); *see also United States v. Hunt*, No. 21-CR-86 (PKC), 2021 WL 5399986, at *16 (E.D.N.Y. Nov. 18, 2021) ("Here, the Court emphasizes the importance of a witness's appearance, tone, inflection, and body language— none of which can be conveyed through the written transcript . . . .").

23

Thus, the most likely facts—and the only facts as to which Defendants have carried their burden—are that Plaintiff stole $3,000 over six months.

## CONCLUSIONS OF LAW

### I.   XBB Was an Enterprise Engaged in Commerce

Plaintiff has established that Sections 206 and 207 of the FLSA apply because, as discussed, XBB's "annual gross volume of sales" were at least $500,000 during the relevant period of time, and it "ha[d] employees handling, selling, or otherwise working on goods or materials that ha[d] moved in or [been] produced for commerce." 29 U.S.C. § 203(s)(1)(A)(i), (ii); *see also id.* §§ 206, 207.  Because "even local business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce, the requirement is satisfied if [Plaintiff] merely handled supplies or equipment that originated out-of-state." *Lili Shi v. DXN Mike Corp.*, No. 16-CV-5185 (ERK) (JO), 2017 WL 1533540, at *1 (E.D.N.Y. Feb. 7, 2017) (quotations and citations omitted).  Thus, Plaintiff has met this threshold element, albeit barely.[15]

### II.   Plaintiff Is Entitled to Wage and Overtime Damages

Plaintiff is entitled to the difference between the wages she received and the relevant minimum wage.  *See Mei Xing Yu*, 944 F.3d at 402; *Rodriguez*, 2019 WL 4482032, at *6; *see also* 29 U.S.C. § 207(a)(1).  She also is entitled to an additional payment of half her regular rate for each hour above 40 she worked per week.  *See Caltenco*, 824 F. App'x at 89 (citing 29 U.S.C.

---

[15] In any event, Plaintiff can recover under the NYLL, which does not have the FLSA's enterprise requirement.  And because the Court has already held a trial on the FLSA and NYLL claims, the Court would exercise supplemental jurisdiction over the NYLL claims regardless of whether Plaintiff met her burden under the FLSA.  *See Liu v. Little Saigon Cuisine Inc.*, No. 18-CV-2181 (RPK) (VMS), 2021 WL 4487839, at *10 (E.D.N.Y. Sept. 30, 2021) (dismissing the plaintiff's FLSA claims for failure to meet the $500,000 requirement, but awarding damages after trial under the NYLL).

§ 207(a)(1); 12 N.Y.C.R.R. §§ 142-2.2, 146-1.4).  Further, Plaintiff is entitled to an additional single payment of the hourly minimum wage for every day she worked more than 10 hours. 12 N.Y.C.R.R. § 142-2.4.  As to all these amounts, Plaintiff is also entitled to prejudgment interest under the NYLL.  N.Y. C.P.L.R. §§ 5001(b), 5004.  And because "[t]here is no proof before the Court that Defendants acted in good faith," the "[i]mposition of liquidated damages in this case is mandatory."  *See Tambriz v. Taste and Sabor LLC*, No. 20-CV-5409 (AJN) (RWL), 2021 WL 6754956, at *10 (S.D.N.Y. Dec. 29, 2021), *report and recommendation adopted* 2022 WL 282918 (S.D.N.Y. Jan. 31, 2022).

Although the evidence establishes by a preponderance that Defendants failed to provide plaintiff with required notices under the NYLL, Plaintiff lacks standing to recover on those claims.  "That is because, based on the record before the Court, it is not clear that [failure to provide Plaintiff with notices] led to an 'injury' that can be recognized by a federal court."  *Francisco v. NY Tex Care*, No. 19-CV-1649 (PKC) (ST), 2022 WL 900603, at *7 (E.D.N.Y. Mar. 28, 2022).  Technical statutory violations that do not lead "to either a tangible injury or something akin to a traditional cause of action," cannot confer Article III standing in federal court.  *Id.* (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 62–63 (2d Cir. 2021)).  Plaintiff has not linked any injury-in-fact to Defendants' failure to provide statutory notices under the NYLL, so she lacks standing to recover on that claim.  *See Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) ("[A] plaintiff must demonstrate standing for each claim she seeks to press." (brackets omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006))).

## III.   The Faithless Employee Doctrine Applies

Because the Court finds that Plaintiff stole $3,000 in increments over the last six months of her employment, she acted as a "faithless employee" under either formulation of the doctrine.

That is, she committed a substantial breach of her fiduciary duty.  *See Feldman*, 977 F.3d at 237.

Plaintiff thus forfeits any "right to compensation," as well as actual compensation paid, "*during*

*the time period* of disloyalty." *Phansalkar*, 344 F.3d at 202, 205 (emphasis in original) (quotations

omitted).   Thus, Plaintiff is not entitled to damages stemming from Defendants' statutory

violations in those six months, and Defendants are entitled to reimbursement of the money Plaintiff

stole "on a theory of recoupment or setoff." *Stefanovic v. Old Heidelberg Corp.*, No. 18-CV-2093

(LTS) (KNF), 2019 WL 3745657, at *2 (S.D.N.Y. Aug. 8, 2019); *see also Phansalkar*, 344 F.3d

at 203 (noting that a faithless employee must "account to his [or her] principal for secret profits").

## DAMAGES CALCUALTION

The following Tables[16] illustrate the amounts Defendants failed to pay Plaintiff, excluding

the amount they failed to pay in the last six months of her employment, during which time they

have established that Plaintiff acted as a faithless employee:

---

[16] Figures in the following tables are rounded to the second decimal place for display purposes.  The totals were calculated before rounding the input values, however.

| Table 1 – Unpaid Wages | | | | | | |
|---|---|---|---|---|---|---|
| Month (Days Worked)[17] | Minimum Wage[18] | Total Hours (per Week)[19] | Daily Salary[20] | Amount Paid[21] | Hourly Rate[22] | Under-payment[23] |
| June 2013 (1) | $7.25 | 10.08 (60.5) | $75 | $75 | $7.44 | $0 |
| July 2013 (27) | $7.25 | 272.25 (60.5) | $75 | $2,025 | $7.44 | $0 |
| August 2013 (26) | $7.25 | 262.17 (60.5) | $75 | $1,950 | $7.44 | $0 |
| September 2013 (26) | $7.25 | 264.33 (61) | $75 | $1,950 | $7.38 | $0 |
| October 2013 (27) | $7.25 | 274.5 (61) | $75 | $2,025 | $7.38 | $0 |
| November 2013 (25) | $7.25 | 252.08 (60.5) | $75 | $1,875 | $7.44 | $0 |
| December 2013 (27) | $7.25 | 272.25 (60.5) | $75 | $2,025 | $7.44 | $0 |

---

[17] The Days Worked figure represents the number of days other than Saturdays during the specified month and year.  Because Plaintiff testified that Saturdays were her only days off, and Defendants presented no evidence that she received holidays off, the Court includes all weekdays and all Sundays in the Days Worked figure.

[18] The Minimum Wage figure represents the minimum wage under the higher of federal or New York law at the time.  *See Rodriguez*, 2019 WL 4482032, at *6 (noting that a "[p]laintiff is entitled to recover the higher of the applicable federal or state minimum wage").  The federal minimum wage for all times relevant to this case was $7.25 an hour.  29 U.S.C. § 206(a)(1)(C).  The New York minimum wage relevant to this case was $7.15 until December 31, 2013, $8 until December 31, 2014, $8.75 until December 31, 2015, $9 until December 31, 2016, and $10.50 thereafter.  N.Y. Lab. Law § 652(1), (1)(a)(ii).

[19] The Total Hours figure represents the number of hours Plaintiff worked during the specified month and year.  Because Plaintiff sufficiently established the average hours she worked per week (60.5 hours during the eight "slow" months and 61 hours during the four "busy" months), and that she worked six days a week, the Court derives the Total Hours figure by multiplying Plaintiff's average daily hours by the number of days Plaintiff worked during the specified month—*e.g.*, 60.5 Hours per Week ÷ 6 Days Worked per Week x Days Worked During Specified Month.

[20] Daily Salary was determined by: Plaintiff's Daily Wage + $5 Meal Stipend.

[21] Amount Paid was determined by: Days Worked x Daily Salary.

[22] Hourly Rate was determined by: Amount Paid ÷ Total Hours.

[23] Underpayment was determined by: Minimum Wage x Total Hours – Regular Rate x Total Hours.

| January 2014 (27) | $8 | 272.25 (60.5) | $75 | $2,025 | $7.44 | $153.00 |
|---|---|---|---|---|---|---|
| February 2014 (24) | $8 | 242 (60.5) | $75 | $1,800 | $7.44 | $136.00 |
| March 2014 (26) | $8 | 264.33 (61) | $75 | $1,950 | $7.38 | $164.67 |
| April 2014 (26) | $8 | 264.33 (61) | $75 | $1,950 | $7.38 | $164.67 |
| May 2014 (26) | $8 | 262.17 (60.5) | $75 | $1,950 | $7.44 | $147.33 |
| June 2014 (26) | $8 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $17.33 |
| July 2014 (27) | $8 | 272.25 (60.5) | $80 | $2,160 | $7.93 | $18.00 |
| August 2014 (26) | $8 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $17.33 |
| September 2014 (26) | $8 | 264.33 (61) | $80 | $2,080 | $7.87 | $34.67 |
| October 2014 (27) | $8 | 274.5 (61) | $80 | $2,160 | $7.87 | $36.00 |
| November 2014 (25) | $8 | 252.08 (60.5) | $80 | $2,000 | $7.93 | $16.67 |
| December 2014 (27) | $8 | 272.25 (60.5) | $80 | $2,160 | $7.93 | $18.00 |
| January 2015 (26) | $8.75 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $213.96 |
| February 2015 (24) | $8.75 | 242 (60.5) | $80 | $1,920 | $7.93 | $197.50 |
| March 2015 (27) | $8.75 | 274.5 (61) | $80 | $2,160 | $7.87 | $241.88 |
| April 2015 (26) | $8.75 | 264.33 (61) | $80 | $2,080 | $7.87 | $232.92 |
| May 2015 (26) | $8.75 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $213.96 |
| June 2015 (26) | $8.75 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $213.96 |
| July 2015 (8) | $8.75 | 80.67 (60.5) | $80 | $640 | $7.93 | $65.83 |
| August 2015 (17) | $8.75 | 171.42 (60.5) | $80 | $1,360 | $7.93 | $139.90 |
| September 2015 (26) | $8.75 | 264.33 (61) | $80 | $2,080 | $7.87 | $232.92 |
| October 2015 (26) | $8.75 | 264.33 (61) | $80 | $2,080 | $7.87 | $232.92 |
| November 2015 (26) | $8.75 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $213.96 |
| December 2015 (27) | $8.75 | 272.25 (60.5) | $80 | $2,160 | $7.93 | $222.19 |
| January 2016 (26) | $9 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $279.50 |
| February 2016 (18) | $9 | 181.5 (60.5) | $80 | $1,440 | $7.93 | $193.50 |
| March 2016 (27) | $9 | 274.5 (61) | $80 | $2,160 | $7.87 | $310.50 |
| April 2016 (25) | $9 | 254.17 (61) | $80 | $2,000 | $7.87 | $287.50 |
| May 2016 (27) | $9 | 272.25 (60.5) | $80 | $2,160 | $7.93 | $290.25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| June 2016 (26) | $9 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $279.50 |
| July 2016 (26) | $9 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $279.50 |
| August 2016 (27) | $9 | 272.25 (60.5) | $80 | $2,160 | $7.93 | $290.25 |
| September 2016 (26) | $9 | 264.33 (61) | $80 | $2,080 | $7.87 | $299.00 |
| October 2016 (26) | $9 | 264.33 (61) | $80 | $2,080 | $7.87 | $299.00 |
| November 2016 (26) | $9 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $279.50 |
| December 2016 (26) | $9 | 262.17 (60.5) | $80 | $2,080 | $7.93 | $279.50 |
| January 2017 (27) | $10.50 | 272.25 (60.5) | $80 | $2,160 | $7.93 | $698.63 |
| February 2017 (24) | $10.50 | 242 (60.5) | $80 | $1,920 | $7.93 | $621.00 |
| March 2017 (27) | $10.50 | 274.5 (61) | $80 | $2,160 | $7.87 | $722.25 |
| ~~April 2017 (25)~~ | ~~$10.50~~ | ~~254.17 (61)~~ | ~~$80~~ | ~~$2,000~~ | ~~$7.87~~ | ~~$668.75~~ |
| ~~May 2017 (27)~~ | ~~$10.50~~ | ~~272.25 (60.5)~~ | ~~$80~~ | ~~$2,160~~ | ~~$7.93~~ | ~~$698.63~~ |
| ~~June 2017 (26)~~ | ~~$10.50~~ | ~~262.17 (60.5)~~ | ~~$80~~ | ~~$2,080~~ | ~~$7.93~~ | ~~$672.75~~ |
| ~~July 2017 (26)~~ | ~~$10.50~~ | ~~262.17 (60.5)~~ | ~~$80~~ | ~~$2,080~~ | ~~$7.93~~ | ~~$672.75~~ |
| ~~August 2017 (27)~~ | ~~$10.50~~ | ~~272.25 (60.5)~~ | ~~$80~~ | ~~$2,160~~ | ~~$7.93~~ | ~~$698.63~~ |
| ~~September 2017 (25)[24]~~ | ~~$10.50~~ | ~~254.17 (61)~~ | ~~$80~~ | ~~$2,000~~ | ~~$7.87~~ | ~~$2,668.75~~ |
| **Total Before April 2017** | | | | | | **$8,754.92** |
| **Total Including April – September 2017** | | | | | | **$14,835.17** |

---

[24] As discussed, Plaintiff was not paid for September 2017, but acted as a faithless employee during that time. Thus, unpaid wages from September 2017 are not included in the compensatory damages calculation, but are included in the liquidated damages and prejudgment interest calculations. *See Calderon*, 2018 WL 2871834, at *9 ("Under the faithless [employee] doctrine, [the plaintiff] is not entitled to compensatory damages—regardless of [the] [d]efendants' willful deprivation—because they would be compensating him for wages earned during his employment and are, therefore, disgorgable. At the same time, however, the Court finds that dismissing [the] [p]laintiff's liquidated damages and prejudgment interest claims would frustrate the deterrent and punitive purposes of the FLSA and NYLL with respect to employers' unlawful conduct.").

| Table 2 – Overtime and Spread of Hours | | | | | |
|---|---|---|---|---|---|
| Month (Days Worked) | Minimum Wage | Total Hours (per Week) | Overtime Hours[25] | Overtime Premium[26] | Spread Premium[27] |
| June 2013 (1) | $7.25 | 10.08 (60.5) | 0 | $0 | $1.19 |
| July 2013 (27) | $7.25 | 272.25 (60.5) | 92.25 | $343.09 | $32.18 |
| August 2013 (26) | $7.25 | 262.17 (60.5) | 88.83 | $330.37 | $30.98 |
| September 2013 (26) | $7.25 | 264.33 (61) | 91 | $335.66 | $61.97 |
| October 2013 (27) | $7.25 | 274.5 (61) | 94.5 | $348.57 | $64.35 |
| November 2013 (25) | $7.25 | 252.08 (60.5) | 85.42 | $317.67 | $29.79 |
| December 2013 (27) | $7.25 | 272.25 (60.5) | 92.25 | $343.08 | $32.18 |
| January 2014 (27) | $8 | 272.25 (60.5) | 92.25 | $369 | $36.00 |
| February 2014 (24) | $8 | 242 (60.5) | 82 | $328 | $32.00 |
| March 2014 (26) | $8 | 264.33 (61) | 91 | $364 | $69.33 |
| April 2014 (26) | $8 | 264.33 (61) | 91 | $364 | $69.33 |
| May 2014 (26) | $8 | 262.17 (60.5) | 88.83 | $355.33 | $34.67 |
| June 2014 (26) | $8 | 262.17 (60.5) | 88.83 | $355.33 | $34.67 |
| July 2014 (27) | $8 | 272.25 (60.5) | 92.25 | $369 | $36.00 |
| August 2014 (26) | $8 | 262.17 (60.5) | 88.83 | $355.33 | $34.67 |
| September 2014 (26) | $8 | 264.33 (61) | 91 | $364 | $69.33 |
| October 2014 (27) | $8 | 274.5 (61) | 94.5 | $378 | $72.00 |

---

[25] Overtime Hours were determined by: Total Hours – (40 Non-overtime Weekly Hours ÷ 6 Days Worked per Week x Days Worked).

[26] Overtime Premium was determined by: Overtime Hours x Regular Rate of Pay ÷ 2. Where the Plaintiff's actual rate of pay is lower than the applicable minimum wage rate, the minimum wage rate is substituted for the regular rate of pay to calculate the overtime premium.

[27] The Spread Premium figure represents an additional hour's pay at the state minimum wage for every day in which Plaintiff worked more than 10 hours. 12 N.Y.C.R.R. § 142-2.4. Because the Court finds that Plaintiff regularly worked from 11:00 a.m. to 9:00 p.m., *i.e.*, 10 hours (Tr. 10:19–23), she "exceeded" 10 hours only one day per week during the slow seasons, when she worked an extra half-hour at least once a week (Tr. 13:11–14:9), and two days per week during busy seasons, when she worked an extra half-hour two days per week (*id.*). Thus, Spread Premium was determined by: Days Worked ÷ 6 x state minimum wage (during slow seasons), and Days Worked ÷ 3 x state minimum wage (during busy seasons).

30

| November 2014 (25) | $8 | 252.08 (60.5) | 85.42 | $341.67 | $33.33 |
| December 2014 (27) | $8 | 272.25 (60.5) | 92.25 | $369 | $36.00 |
| January 2015 (26) | $8.75 | 262.17 (60.5) | 88.83 | $388.65 | $37.92 |
| February 2015 (24) | $8.75 | 242 (60.5) | 82 | $358.75 | $35.00 |
| March 2015 (27) | $8.75 | 274.5 (61) | 94.5 | $413.44 | $78.75 |
| April 2015 (26) | $8.75 | 264.33 (61) | 91 | $398.12 | $75.83 |
| May 2015 (26) | $8.75 | 262.17 (60.5) | 88.83 | $388.65 | $37.92 |
| June 2015 (26) | $8.75 | 262.17 (60.5) | 88.83 | $388.65 | $37.92 |
| July 2015 (8) | $8.75 | 80.67 (60.5) | 27.33 | $119.59 | $11.67 |
| August 2015 (17) | $8.75 | 171.42 (60.5) | 58.08 | $254.11 | $24.79 |
| September 2015 (26) | $8.75 | 264.33 (61) | 91 | $398.13 | $75.83 |
| October 2015 (26) | $8.75 | 264.33 (61) | 91 | $398.13 | $75.83 |
| November 2015 (26) | $8.75 | 262.17 (60.5) | 88.83 | $388.65 | $37.92 |
| December 2015 (27) | $8.75 | 272.25 (60.5) | 92.25 | $403.59 | $39.38 |
| January 2016 (26) | $9 | 262.17 (60.5) | 88.83 | $399.75 | $39.00 |
| February 2016 (18) | $9 | 181.5 (60.5) | 61.5 | $276.75 | $27.00 |
| March 2016 (27) | $9 | 274.5 (61) | 94.5 | $425.25 | $81.00 |
| April 2016 (25) | $9 | 254.17 (61) | 87.5 | $393.75 | $75.00 |
| May 2016 (27) | $9 | 272.25 (60.5) | 92.25 | $415.13 | $40.50 |
| June 2016 (26) | $9 | 262.17 (60.5) | 88.83 | $399.75 | $39.00 |
| July 2016 (26) | $9 | 262.17 (60.5) | 88.83 | $399.75 | $39.00 |
| August 2016 (27) | $9 | 272.25 (60.5) | 92.25 | $415.13 | $40.50 |
| September 2016 (26) | $9 | 264.33 (61) | 91 | $409.5 | $78.00 |
| October 2016 (26) | $9 | 264.33 (61) | 91 | $409.5 | $78.00 |
| November 2016 (26) | $9 | 262.17 (60.5) | 88.83 | $399.75 | $39.00 |
| December 2016 (26) | $9 | 262.17 (60.5) | 88.83 | $399.75 | $39.00 |
| January 2017 (27) | $10.50 | 272.25 (60.5) | 92.25 | $484.31 | $47.25 |
| February 2017 (24) | $10.50 | 242 (60.5) | 82 | $430.5 | $42.00 |
| March 2017 (27) | $10.50 | 274.5 (61) | 94.5 | $496.13 | $94.50 |

| | | | | |
|---|---|---|---|---|
| ~~April 2017 (25)~~ | ~~$10.50~~ | ~~254.17 (61)~~ | ~~87.5~~ | ~~$459.38~~ | ~~-$87.50~~ |
| ~~May 2017 (27)~~ | ~~$10.50~~ | ~~272.25 (60.5)~~ | ~~92.25~~ | ~~$484.31~~ | ~~-$47.25~~ |
| ~~June 2017 (26)~~ | ~~$10.50~~ | ~~262.17 (60.5)~~ | ~~88.83~~ | ~~$466.38~~ | ~~-$45.50~~ |
| ~~July 2017 (26)~~ | ~~$10.50~~ | ~~262.17 (60.5)~~ | ~~88.83~~ | ~~$466.38~~ | ~~-$45.50~~ |
| ~~August 2017 (27)~~ | ~~$10.50~~ | ~~272.25 (60.5)~~ | ~~92.25~~ | ~~$484.31~~ | ~~-$47.25~~ |
| ~~September 2017 (25)~~ | ~~$10.50~~ | ~~254.17 (61)~~ | ~~87.5~~ | ~~$459.38~~ | ~~-$87.50~~ |
| **Total Before April 2017** | | | | **$16,784.21** | **$2,177.48** |
| **Total Including April – September 2017** | | | | **$19,604.33** | **$2,537.98** |

Thus, the principal damages for wage violations, excluding the time after Plaintiff began stealing, are $8,754.92 + $16,784.21 + $2,177.48 = $27,716.61.  For prejudgment interest under the NYLL, the Court selects August 15, 2015 as the midpoint between June 29, 2013 (Plaintiff's start date) and September 30, 2017 (Plaintiff's end date).  The Court then multiplies the principal damages including the time after Plaintiff started stealing, $36,977.48, by the interest rate of 9%, and by the time period of 6.62 years (the time between the midpoint date and March 29, 2022, the date of this Memorandum & Order).  *See, e.g.*, *Fermin*, 93 F. Supp. 3d at 50 ("Multiplying the principal of $187,970.83 by the interest rate of 9%, and by the time period of 4.52 years, the prejudgment interest totals $76,466.53.").  The result is $22,031.18 in prejudgment interest.  The Court then adds $36,977.48 in liquidated damages.[28]  The total damages calculation, therefore, is

---

[28] As noted, the Court includes in the liquidated damages and prejudgment interest calculations Defendants' failure to pay Plaintiff required wages for the six months during which Plaintiff stole from XBB.  "Because the primary purposes of the liquidated damages provision of the FLSA and NYLL are to deter and punish the employer, rather than compensate the employee,"

as follows:  $27,716.61 + $36,977.48 + $22,031.18 = $86,725.27.  The Court then subtracts the $3,000 Plaintiff stole from Defendants, leaving **$83,725.27**.

## CONCLUSION

After carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, the Court concludes that Plaintiff has met her burden of proof as to all her claims, and Defendants have carried their burden (except as to the offset amount) as to their partial defense under the "faithless employee" doctrine.  For the reasons above, Plaintiff is entitled to **$83,725.27** in damages.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 29, 2022
       Brooklyn, New York

---

a plaintiff who acts as a faithless employee "can still recover liquidated damages and pre-judgment interest under the FLSA and NYLL."  *Calderon*, 2018 WL 2871834, at *8.